IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


DENNIS R. HATHAWAY                                                    PLAINTIFF


        v.                          CIVIL NO. 10-3013


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                       DEFENDANT

## MEMORANDUM OPINION

        Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a

decision of the Commissioner of the Social Security Administration (Commissioner) denying

his claim for supplemental security income (SSI) benefits under the provisions of Title XVI of

the Social Security Act (Act).  In this judicial review, the Court must determine whether there

is substantial evidence in the administrative record to support the Commissioner's decision.  See

42 U.S.C. § 405(g).

## I.        Procedural Background

        Plaintiff protectively filed his current application for SSI on July 21, 2008, alleging an

inability to work since May 1, 2007, due to partial blindness and a mental impairment. (Tr.12).

An administrative hearing was held on June 24, 2009, at which Plaintiff, Plaintiff's wife, and a

vocational expert (VE) appeared and testified.  (Tr. 12, 222-66).

        By written decision dated December 1, 2009, the ALJ found that Plaintiff had not been

under a disability within the meaning of the Social Security Act since July 21, 2008, the day the

application was filed. (Tr. 12).  The ALJ found that during the relevant time period, Plaintiff had

an impairment or combination of impairments that were severe—astigmatism and disruptive

behavior disorder. (Tr. 14). After reviewing all of the evidence presented, however, the ALJ determined that Plaintiff's impairments did not meet or medically equal any of the listed impairments listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 14). The ALJ found that Plaintiff had no exertional limitations and retained the residual functional capacity (RFC) to:

> perform work that does not require far visual acuity. The claimant can understand, remember, and carry out simple, routine, and repetitive tasks. Additionally, the claimant can respond appropriately to the supervisors and usual work situations and can have occasional contact with co-workers, but the claimant can have no contact with the general public.

(Tr. 15-16). With the help of the vocational expert (VE), the ALJ determined that Plaintiff could perform past relevant work as a lumber stacker. (Tr. 18).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on January 14, 2010. (Tr. 3-7). Subsequently, Plaintiff filed this action. (Doc. 1). The case is before the undersigned pursuant to consent of the parties. (Doc. 6). Both parties have filed briefs and the case is now ready for decision. (Docs. 9, 10).

## II.    Evidence Presented

At the administrative hearing held before the ALJ on July 24, 2009, Plaintiff testified that he was forty-seven years of age and had obtained an eighth-grade education. (Tr. 228, 246).[1] Plaintiff has past work experience as a lumber stacker at a sawmill. (Tr. 90, 249).

Plaintiff claimed that injuries occurring before the relevant time period have contributed to his claimed impairments, specifically citing injuries to the head. (Tr. 225). The record reflects that Plaintiff sustained and was treated for several injuries between December 1981 and January

---

[1] Plaintiff claims to have been in special-education programs throughout school. (Tr. 237-38).

2007, including, but not limited to:  a laceration to the head in November 1981; multiple body bruises and dislocation of C2 of the cervical spine from an altercation in December 1986; lacerations and contusion of the scalp from being struck with a skillet in June 1987; a contusion of the chest wall from a  vehicular accident in August 1993; and traumatic iritis[2]  from an altercation in January of 2007. (Tr. 188-209).

On August 28, 2008, Dr. Robert L. Hudson, an examining medical consultant, conducted a Mental Diagnostic Evaluation and Intellectual Assessment. (Tr. 150).  Dr. Hudson noted that Plaintiff was pleasant and cooperative, understood directions, and that good rapport was easily established and maintained.  Plaintiff indicated that he "doesn't so much get anxious around people as that he just does not like to be around people."  (Tr. 151).  Dr. Hudson noted that Plaintiff wore non-prescription glasses and could see the numbers on the vocabulary test.  No formal testing was done, but Dr. Hudson concluded that Plaintiff was "probably functionally illiterate." (Tr. 152).  Dr. Hudson found that while Plaintiff could converse well, he could  read and write "only at presumably insignificant levels" and that IQ and literacy issues would limit Plaintiff to labor jobs.  In terms of concentration, Dr. Hudson noted that Plaintiff was "limited, but [was] clearly better on some tasks than others" and that there appeared to be no problems with persistence in completing tasks. (Tr. 152).  As to timeliness, Dr. Hudson noted that Plaintiff would do "intellectual tasks like was done in WAIS today slowly.  It's not clear if this slow speed is a problem with basic labor tasks."  (Tr. 152).  Dr. Hudson found Plaintiff to have a

---

[2] Iritis is "inflammation of the iris, usually marked by pain, congestion in the ciliary region, photophobia, contraction of the pupil, and discoloration of the iris." Dorlands's Illustrated Medical Dictionary 974 (31st ed. 2007).  The Court notes that Plaintiff was instructed to schedule a follow-up appointment for the eye injury, but there is no record of a follow up visit.  (Tr. 208-09).

verbal IQ of 75, a performance IQ of 69, and a full-scale IQ of 70.  (Tr. 151).  Dr.  Hudson's

provisional DSM-IV diagnoses included:

| | |
|---|---|
| Axis I: | 312.19, Disruptive Behavior Disorder NOS (probable by Hx) |
| | Alcohol Abuse (in full remission) |
| Axis II: | 317, Mild Mental Retardation |
| Axis III: | Defer to Physical |
| Axis V: | GAF = 48-52. |

(Tr. 152).

On September 2, 2008, Dr. Priscilla Arnold examined Plaintiff's eyes and vision.  She

noted that Plaintiff had not had true prescription glasses for the past twenty years.   Dr. Arnold

found that Plaintiff's visual acuity, without correction, was 20/400 in each eye.  With refraction,

his visual acuity could be corrected to 20/40 in the right eye and 20/50 in the left eye.  Dr. Arnold

diagnosed Plaintiff with:  (1) high hyperopic astigmatism, which needed to be corrected by

glasses; (2) moderate amblyopia[3] of the left eye; (3) anisocoria,[4] right pupil larger than left; (4)

recurring headaches by history; (5) increased intraocular pressure in the right eye, suggestive of

glaucoma; and (6) very mild early cataract formation.  (Tr. 154).   Dr. Arnold opined that

Plaintiff "could be helped significantly by having the glasses made according to the correction

found at the time of the examination" and that, due to signs of potential glaucoma damage,

Plaintiff "should have further intraocular pressure testing and [a] retinal nerve fiber scan

performed."  (Tr. 154).

On September 10, 2008, Dr. Brad Williams, a non-examining medical consultant,

completed a psychiatric review technique form, indicating that Plaintiff had:  mild restrictions

---

[3] Amblyopia is "impairment of vision without detectable organic lesion of the eye."  Id. at 58.
[4] Anisocoria is "inequality in diameter of the pupils."  Id. at 93.

AO72A
(Rev. 8/82)

on his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 162-75). Dr. Williams diagnosed Plaintiff with mild mental retardation based upon his IQ and MSCE scores, but remarked that Plaintiff was capable of basic work. (Tr. 166, 174).[5] After reviewing all of the evidence, Dr. Kathryn Gale, a non-examining medical consultant, affirmed Dr. Williams's findings on November 17, 2008. (Tr. 162).

Dr. Williams also completed a mental RFC assessment, stating that Plaintiff had moderate limitations in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to make simple, work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; the ability to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to set realistic goals or make plans independently of others. (Tr. 158-59). Dr. Williams concluded that Plaintiff "is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variable[s], little judgment; supervision required is simple, direct and concrete." (Tr. 160). After reviewing all of the evidence, Dr. Gale affirmed Dr. Williams's findings on November 17, 2008. (Tr. 160).

On September 18, 2008, Dr. Jerry L. Thomas, a non-examining medical consultant, completed a physical RFC assessment, finding no exertional, postural, manipulative,

_____

[5] The consultant's notes contain some illegible remarks that are not included here. (Tr. 174).

-5-

communicative, or environmental limitations.    (Tr. 176-83).  Dr. Thomas did find visual

limitations for work areas in which excellent vision was required.  (Tr. 179).[6]

On December 1, 2008, Dr. Vann Arthur Smith conducted a neuropsychological

evaluation of Plaintiff, at the request of Plaintiff's attorney.  (Tr. 210-14).  Dr. Smith stated in

his evaluation report that Plaintiff's "[c]linical history, as obtained from the patient and his

spouse, is considered reliable.  Medical records are being requested for review."  (Tr. 211).

However, there is no indication that Dr. Smith obtained or considered any other medical records.[7]

Dr. Smith's report found Plaintiff's medical history to be significant for Plaintiff's "history of

worsening neurocognitive symptoms" (Tr. 211).[8]  Dr. Smith opined that:

> This patient's clinical history, mental status exam and neuropsychodiagnostic
> screening test profile data reveal a pattern of abnormal responses and
> pathognomonic indices consistent with the presence of diffuse, bilateral organic
> brain dysfunction.  The pattern of abnormal findings noted across the patient's
> neuropsychodiagnostic test profile is similar to that seen commonly in association
> with:  (1) traumatic brain insult and the sequelae thereof and (2) metabolic,
> hypoxic, toxic, or cerebrovascular encephalopathies.
>
> These findings, are to a significant degree of scientific certainty, consistent with
> the patient's reported clinical history.  Resulting neurocognitive symptoms
> interfere significantly with the patient's capacity to carry out routine daily
> activities in a consistent manner.  This renders the patient, in my clinical opinion,
> disabled at this time.

 (Tr. 214).

---

[6] The written statement is somewhat illegible, but appears to state, "Detract in work areas where excellent vision required."  (Tr. 179).

[7] Dr. Smith's report contains only the references to the clinical history, as obtained from Plaintiff and his spouse, and the record does not contain a subsequent report from Dr. Smith to confirm that he did obtain medical records or other evidence.

[8] Dr. Smith stated that Plaintiff presented with a history of:  (1) impaired recall memory; (2) impaired attention to sequential detail; (3) impaired concentration; (4) impaired executive function; (5) word finding impairment; (6) sleep pattern disturbance; and (7) affective liability with impulse dyscontrol (angry outburst followed by fatigue and temporal disorientation).  (Tr. 211).

AO72A
(Rev. 8/82)

In a mental RFC questionnaire dated December 2, 2009,[9] Dr. Smith also diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | 294. 9 (Cognitive Dysfunction, Non-psychotic, Secondary to General Medical Condition(s)) |
| Axis II: | V62.89 (Borderline Intellectual Functioning)[10] |
| Axis III: | 1) TBI (Multiple)[11] |
| | 2) Elevated Intraocular Eye Pressure |
| | 3) CAD (SOB with minimal exertion)[12] |
| Axis IV: | Chronic Slowly [illegible] |
| Axis V: | Current GAF—30 |
| | Highest GAF [illegible]—60-65 |

(Tr. 214-15).

Dr. Smith found that Plaintiff was unable to meet competitive standards for the mental ability to do unskilled work in the following categories:

Remembering work-like procedure; maintaining attention for two hour segment[s]; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in a routine work setting; and being aware of normal hazards and taking appropriate precautions.

(Tr. 217).

_____

[9] Dr. Smith's RFC questionnaire is largely handwritten and very difficult to decipher in places.

[10] The Court relies on the corresponding diagnoses from Dr. Smith's neurological evaluation of December 1, 2008 for elaborating on the Axis I and Axis II diagnoses. (Tr. 214-15).

[11] The Court presumes this acronym to refer to Traumatic Brain Injury. See Dorland's, supra note 2, at 1897.

[12] The Court presumes these acronyms to refer to coronary artery disease and shortness of breath, respectively. See id. at 1754.

-7-

Dr. Smith further found that Plaintiff was unable to meet competitive standards in any of the four possible categories for skilled and semi-skilled work.  (Tr. 217).  Dr. Smith further listed Plaintiff as seriously limited, but not precluded, in five of five categories for mental abilities to do particular types of jobs.  (Tr. 218).  He also stated that Plaintiff had reduced intellectual functioning based on his verbal IQ of 84,[13] that Plaintiff's impairments would likely cause him to be absent from work for more than four days per month, and that these impairments had lasted or would last over twelve months.  (Tr. 218).

In his July 21, 2008 application for SSI, Plaintiff complained of "left eye blindness" and that he was a "slow learner."  (Tr. 63).  Plaintiff indicated that this made it difficult to get along with people and hard for him to read and write.  (Tr. 77). He indicated that he stopped working because he "couldn't get along with folks."  (Tr. 77).

Plaintiff and his wife completed a function report on August 15, 2008, wherein he indicated that he had no problems with personal care, except that his wife helped him with grooming and shaving because he could not see well enough to get it straight.  (Tr. 96).  He indicated that he could not use cooking directions or recipes but had learned to prepare simple meals that were "good enough to eat."  Plaintiff also indicated that he was able to take out the trash, mow the grass, and do laundry and dishes.  These tasks required average time to complete, except for mowing.  Also, his wife would go over the dishes and laundry because he did not always clean them sufficiently.  (Tr. 97).  Plaintiff indicated that he did not drive, had never had a driver's license, and had previously failed the eye test at the DMV.  (Tr. 98).  He was able to

---

[13] Dr. Smith found Plaintiff to have a verbal IQ of 84; a performance IQ of 91; and a full-scale IQ of 86. (Tr. 212).  Dr. Hudson's comparable numbers were 75, 69, and 70, respectively.  (Tr. 151).

pay bills and count change, but unable to handle a savings account or use a checkbook.  His hobbies included watching television and fishing, but he required assistance with fishing because he could not see to thread the hooks.  (Tr. 99).  He did not like to go out much and had problems getting along with family, friends, neighbors, or others, stating, "I don't like many people." (Tr. 100).  Plaintiff also indicated that his conditions affected his sight, concentration, understanding, and ability to follow instructions.  Plaintiff stated that he got along with authority figures "okay," had not been fired from a job because of problems getting along with others, but had quit for being threatened with being fired for missing too much work and his inability to get along with "a couple guys."  (Tr. 101).  Plaintiff indicated that he handled stress as well as anyone else.  Plaintiff stated that he used glasses or contacts, but that they were not prescribed by a doctor.  He found that reading glasses prevented headaches the same as prescription glasses.  (Tr. 101).

In an October 1, 2008 disability report, Plaintiff stated that he had to have someone drive him and fill out paperwork for him.  (Tr. 105).  Plaintiff's wife remarked that his vision and learning abilities had always been poor, that he had been denied jobs because of both, and that he could not complete the applications.  She stated that his lack of work history was a huge obstacle to obtaining employment.  She further remarked that Plaintiff had problems with attendance and getting along with others at previous jobs, partly due to alcohol issues and partly due to anger issues or depression.  She indicated that he had been sober for a year at that point, but that his anger problems were still present and his depression seemed worse.  She attributed much of his depression to his inability to provide for his family.  (Tr. 111-12).

-9-

In a November 29, 2008 disability report, Plaintiff's wife stated that his irritation and anger "flare ups" seemed to be occurring more often and that he often forgot what happened when in this state. She indicated that they were currently gathering the necessary paperwork forms for the Christian Clinic in order for him to see a doctor about his medical problems. (Tr. 113-19).

In a questionnaire dated June 15, 2009, completed for his attorney, Plaintiff listed "poor eyesight, learning disabilities, anger outbursts, and depression" as health problems rendering him unable to work. (Tr. 127). Plaintiff indicated that prior to his job at the sawmill, his medical problems required him to make adjustments, requiring "a lot of absences." (Tr. 130). Plaintiff indicated that he was not on prescription medications, was not currently seeing a doctor, and had not seen one or had any hospitalizations or outpatient visits in the five years prior to becoming unable to work. (Tr. 135). He indicated that he occasionally cooked, vacuumed, mopped, and did yard work, but that he needed help with all of these. He stated that he gathered wood, brush, and paper to burn in the backyard, and that he watched sixteen hours of television a day. (Tr. 141). He listed his general limitations as: the inability to do applications and paper work; trouble staying focused; and problems getting along with others. (Tr. 142). He offered no response for physical or exertional limitations. (Tr. 142). Plaintiff's wife also stated that he had been having more frequent anger outbursts, with no memory afterwards, followed by depression and exhaustion. (Tr. 147).

At the June 24, 2009 hearing before the ALJ, Plaintiff complained that he had some difficulties reading, that he did not know what bigger words meant, was not good at spelling, and that he could read street signs if they were close. (Tr. 229). Plaintiff described his math skills

-10-

as fair, and stated that he could perform simple addition and subtraction.  He agreed that he could make change for a five- or ten-dollar bill.  Plaintiff's wife testified that he knew the change from a twenty-dollar item was fifteen dollars, but that he would not know the change for an item costing eleven dollars and eleven cents.  (Tr. 230, 257).  Plaintiff confirmed his medical history of head injuries and described the resulting problems as pain and headaches and a desire to be alone when friends or family were over.  (Tr. 233-36).  Plaintiff also indicated that he had magnifying glasses for reading.  He also testified that his schooling was all in special-education classes, and although he was never told why he was in special-education, he just guessed that he was "slow."  (Tr. 237-38).  Plaintiff also stated that he drank probably forty cups of coffee a day, but had not informed his doctors of this fact.  (Tr. 241, 247).  He testified that he saw things that were not there while his wife was driving.  Plaintiff's wife testified that he thought things were closer than they were while she was driving.  (Tr. 244, 255).  Plaintiff described his problems at his previous job at the sawmill, and stated that he had four or five different things "coming at him" that needed to be placed in the correct stack, it became aggravating when he would place them in the wrong stack, and when he could not keep up, his boss would approach.  (Tr. 247-50).

Plaintiff's wife also testified that Plaintiff's depression was a problem and that he did not want to do anything, did not want to eat, and had lost considerable weight.  (Tr. 254-58).  She stated that his anger was a problem at his last job at the sawmill and that he would miss a day or two every week because he was depressed or would make excuses, such as being tired or not feeling well.  (Tr. 258-59).

-11-

### III.    Applicable Law

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

-12-

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520, 416.920.

IV.    **Discussion**

Plaintiff contends that the ALJ erred in concluding that Plaintiff is not disabled.  (Doc. 9).  Defendant argues that substantial evidence supports the ALJ's determination.  (Doc. 10).

A.    **Severe Impairment Determination**

The ALJ concluded that Plaintiff had two severe impairments, astigmatism and disruptive behavior disorder.  (Tr. 14).  An impairment or combination of impairments is not severe if it does not significantly limit the Plaintiff's physical or mental abilities to do basic work activities. 20 C.F.R. § 416.921(a).  Basic work activities refer to the abilities and aptitudes necessary to do most jobs, such as capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, co-workers and unusual work settings; and dealing with changes in routine work setting. 20 C.F.R. § 416.921(b).

-13-

Proof of a disabling impairment must be supported by at least some objective medical evidence. Marolf v. Sullivan, 981 F.2d 976, 978 (8th Cir. 1992).

Plaintiff contends that the ALJ erred in failing to find that Plaintiff's neurocognitive dysfunction and mild mental retardation were severe impairments. (Doc. 9).  Plaintiff's alleged neurocognitive dysfunction impairment was based on Dr. Vann Smith's examination and opinion, which the ALJ afforded little weight, as discussed below.  Furthermore, no objective medical evidence supports the impairment of neurocognitive dysfunction.  Dr. Hudson did diagnose Plaintiff with mild mental retardation, but his diagnosis established that Plaintiff was still capable of basic work activities.  Dr. Hudson noted that Plaintiff was able to do rather well on arithmetic in his head, that he had no significant limits on persistence in completing tasks, and specifically stated that his IQ and literacy issues would limit him to labor jobs.  (Tr. 152). Moreover, Plaintiff's own descriptions of problems at his previous job focused on his behavior and attendance problems.  (Tr. 128, 130, 258-59).  Accordingly, substantial evidence supports the ALJ's severe impairment determination.

### B.    Impairment Listing

Plaintiff argues that the ALJ erred in concluding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.  (Tr. 14).  The burden of proof is on Plaintiff to establish that his impairments meet or equal a listing, and Plaintiff must meet all of the listing's specific criteria.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990) ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.")).  The ALJ specifically found that Plaintiff did not meet

-14-

the criteria of either listing 2.00, visual disorders, or listing 12.04, affective disorders. (Tr. 14).

Plaintiff contends that the ALJ erred in not discussing section 12.05 and not finding that

Plaintiff's mental retardation met the requirements of listing 12.05 (C). (Doc. 9). The Court

disagrees.

First, "[a]lthough it is preferable that ALJs address a specific listing, failure to do so is

not reversible error if the record supports the overall conclusion . . . ." Pepper ex rel. Gardner

v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003) (citing Dunahoo v. Apfel, 241 F.3d 1033, 1037

(8th Cir. 2001) (holding a failure to explain why the claimant did not meet the listing for

rheumatoid arthritis was not an error); Briggs v. Callahan, 139 F.3d 606, 609 (8th Cir. 1998)

("Although the ALJ did not specifically discuss [the] condition in the context of listing

112.05(D), we find the record supported the conclusion . . . .")). Here, the record does support

the ALJ's conclusion. Plaintiff argues that he met the requirements in paragraph "C" of 12.05,

which requires both "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a

physical or other mental impairment imposing an additional and significant work-related

limitation of function." 20 C.F.R. pt. 404, subpt. P, app.1, §12.05(C). Plaintiff cites Dr.

Hudson's finding of a performance I.Q. of 69 for the first requirement, and argues that his

disruptive behavior disorder satisfies the second as a mental impairment imposing an additional

and significant work-related limitation of function. (Doc. 9). However, Plaintiff must first meet

the listing's introductory paragraph, which requires a showing of "significantly subaverage

general intellectual functioning with deficits in adaptive functioning initially manifested during

the developmental period; i.e., the evidence demonstrates or supports onset of the impairment

-15-

before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.[14]  See Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006) ("[T]he requirements in the introductory paragraph [of Listing 12.05] are mandatory."). Even if a Plaintiff meets requirements of paragraph C, he must also show that any deficits in adaptive functioning manifested themselves during the developmental period. See Cheatum v. Astrue, 388 F. App'x. 574, 576-77 (8th Cir. 2010).

Substantial evidence supports a determination that Plaintiff failed to demonstrate the necessary deficits in adaptive functioning, despite one of Plaintiff's IQ scores falling within the proscribed range.  See, e.g., Cheatum v. Astrue, 388 F. App'x. 574, 576-77 (8th Cir. 2010) (holding that Plaintiff failed to meet 12.05(C) for failure to demonstrate deficits in adaptive functioning despite a qualifying IQ and the additional impairment of lupus). As discussed above, Dr. Hudson found that Plaintiff was pleasant and cooperative, with rapport easily established, and opined that he could perform labor jobs. (Tr. 151-52). Plaintiff testified that he was able to perform many activities of daily living, could handle money and count change, handle light housework, feed himself, and go fishing. (Tr. 97-99). The record indicates that Plaintiff was capable of driving himself, although he did so illegally, prior to his vision problems. (Tr. 98, 152-53, 260). See Cheatum, 388 F. App'x at 577 (finding the ability to drive a car as one factor weighing against adaptive impairments). (Tr. 152-53, 260). Also, the record suggests that Plaintiff has maintained some measure of social interaction with his family and some friends.

---

[14] Also, the introduction to Section 12.00 states that:

Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.

-16-

(Tr. 95, 147, 152-53, 245-46).  Moreover, Plaintiff was not fired from his last job for reasons related to deficits in adaptive functioning.  He chose to quit because he was upset with his boss, and his largest hurdle to obtaining employment since then appears to have been his inability to read the applications due to vision problems.  (Tr. 94, 111-12, 128, 142).  See Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004) (finding no significant deficits in adaptive functioning for 12.05 where Plaintiff testified that he would be working, had he not been fired, and was looking for work at the time of the hearing).  Indeed, Plaintiff's claimed difficulties are either reasonably or admittedly attributable to his behavioral and vision problems.  (Tr. 77, 96-97, 100, 112, 117, 229, 236, 241, 244-46, 250).  Lastly, while Plaintiff does claim to have been in special-education classes, the record does not conclusively reflect why Plaintiff was there or that a qualified mental-health professional placed him there for adaptive deficiencies.  (Tr. 237-38).  See Cheatum, 388 F. App'x at 576.

The Court also notes that even if Plaintiff's IQ is presumed to have been at the impairment level prior to age twenty-two,[15] he appears to argue that his multiple head injuries have worsened his cognitive abilities, which would undermine any claim that any deficits in adaptive functioning fully manifested themselves during the developmental period.  (Tr. 225).  Accordingly, despite the ALJ's failure to discuss the specific 12.05 listing, the record supports his overall conclusion.

---

[15] See Maresh v. Barnhart 438 F.3d 897, 900 (8th Cir. 2006) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.") (internal quotations and citations omitted); see also 65 Fed.Reg. 50,753 (2000) (explaining that the regulations "permit us to use judgment, based on current evidence, to infer when the impairment began.").

-17-

### C.     Failure to Give Dr. Vann Smith's Opinion Proper Weight

Plaintiff argues that the ALJ failed to give the opinion of examining physician, Dr. Vann Smith, proper weight.  The ALJ may not substitute his opinions for those of the physician.  <u>Finch v. Astrue</u>, 547 F.3d 933, 938 (8th Cir. 2008).  However, "[t]he ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole.  It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  <u>Estes v Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002) (citations and internal quotation marks omitted). In the present case, the ALJ discussed Dr. Smith's evaluation at length and pointed out several flaws in Dr. Smith's statements and conclusions.  (Tr. 86-87).  The ALJ concluded as follows:

> The undersigned has also considered the opinion of Dr. Smith.  However, the limitations in the mental [RFC] questionnaire completed by Dr. Smith appear to be excessive based on a snapshot mental status interview and one series of tests. Dr. Smith opined that the claimant's "neurocognitive symptoms interfere significantly with the patient's capacity to carry out routine daily capacities in a consistent manner."  The evidence of record as a whole and specifically the function report completed by claimant's wife (Exhibit 5E) does not support the severity of the functional limitations set forth by Dr. Smith.  Therefore, the undersigned gives little weight to the opinion of Dr. Smith.

(Tr. 17-18).

Plaintiff argues that the ALJ lacks the expertise in neuropsychology to label the limitations set forth by Dr. Smith as excessive and that the ALJ substituted his own "medical" judgment for that of Dr. Smith.  (Doc. 9).  This Court does not agree.  Other courts have affirmed decisions in which one-time examination reports from Dr. Vann Smith were accorded little weight.  <u>See</u> <u>Hudson v. Barnhart</u>, 137 F. App'x. 935, 936 (8th Cir. Jul. 6, 2005) ("The ALJ gave good reasons for his resolution of the conflict between the mental RFC opinion of Dr. Smith versus those of consulting psychologist Paul Iles and the agency reviewing psychologists.").  In

-18-

Clement v. Barnhart, 186 F. App'x 702, 703 (8th Cir. June 26, 2006), the Eighth Circuit concluded that the ALJ properly discounted the RFC assessment in Dr. Smith's report "after finding it was not supported by his own testing and evaluation, or by other medical evidence in the record, and was inconsistent with Clement's reported daily activities." Id. District Courts in the Western District of Arkansas have affirmed the ALJ decisions which accorded little weight to Dr. Vann Smith's opinions. See Cole v. Astrue, No. 08-3036, 2009 WL 3158209, at *8 (W.D. Ark. Sept. 29, 2009) (holding that Dr. Smith's opinion was inconsistent with the remaining medical evidence of record); Partee v. Astrue, No. 08-3030, 2009 WL 2987398, at *1 (W.D. Ark. Sept. 14, 2009) (holding that the ALJ clearly recited the evidence of record and why he gave more weight to the findings of Dr. Bunting over that of Dr. Smith); Haarstad v. Astrue, 2009 WL 2324711, No. 3:08-cv-03001, at *5 (W.D. Ark. July 27, 2009). The court in Cole also found that the ALJ was not biased against Dr. Smith, but had merely pointed out the "inconsistencies within Dr. Smith's assessment and the inconsistencies between Dr. Smith's assessment and the other medical evidence of record." 2009 WL 3158209, at *8 n.1. The Court believes that the ALJ in the instant case acted exactly as did the ALJ in Cole.

The Court believes that the ALJ properly found Dr. Smith's findings and examination inconsistent with other evidence. In his RFC determination, the ALJ specifically noted that Dr. Hudson did not find any current limitations in his diagnosis of disruptive behavior disorder and that Dr. Hudson's report stated that Plaintiff had no trouble conversing, following instructions, or completing tasks. (Tr. 16). Moreover, the record reflects that the mental RFC conducted by Dr. Williams directly conflicts with that of Dr. Smith. Dr. Williams concluded that Plaintiff was able to perform work where interpersonal contact is incidental to work performed, such as

AO72A
(Rev. 8/82)

assembly work. (Tr. 160). Also, while Dr. Smith found that Plaintiff was severely limited and disabled, he actually scored Plaintiff's IQ significantly higher than did Dr. Hudson. (Tr. 151, 212).[16]

The ALJ expressly referenced the record in finding the limitations set forth in Dr. Smith's opinion as excessive, stating, "The evidence of record as a whole and specifically the function report completed by the claimant's wife does not support the severity of the functional limitations set forth by Dr. Smith." (Tr. 17-18).[17]  The Court believes that the ALJ properly exercised his discretion in finding that the limitations found in Dr. Smith's opinion were excessive in light of the record as a whole. Therefore, the Court finds that substantial evidence supports the ALJ's decision to afford Dr. Smith's opinion little weight.

### D.    Subjective Complaints and Credibility Analysis

The Court next addresses the ALJ's assessment of Plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's

---

[16] Dr. Smith scored Plaintiff's IQ values at 84, 91, and 86, compared to Dr. Hudson's 75, 69, and 70. The Court also notes that Dr. Smith's opinion that Plaintiff was disabled involves an issue reserved for the Commissioner. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

[17] The ALJ cited the function report, Exhibit 5E, in finding that Plaintiff had a mild restriction in activities of daily living; moderate difficulties in social functioning; and moderate difficulties with regard to concentration. (Tr. 14-15). Plaintiff argues that the function report "is an inappropriate basis on which to compare Dr. Smith's [mental RFC]." (Doc. 9, p.18). While Plaintiff offers no legal authority for this argument, this Court reiterates that in Clement v. Barnhart, supra, the Eighth Circuit found that the ALJ properly discounted Dr. Smith's RFC assessment after finding it was not supported by, among other things, the Plaintiff's reported daily activities. Clement, 186 F. App'x at 703.

subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). Further, "[t]he ALJ need not explicitly discuss each *Polaski* factor . . . . It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (holding that ALJ properly discounted the claimant's subjective complaint's where ALJ stated that "he was considering the factors and then went on to discuss in detail why the medical evidence was inconsistent with [the claimant's] testimony.").

After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.  The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but found Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms to not be credible to the extent that they were inconsistent with the RFC assessment.  Plaintiff contends that the ALJ's failure to specifically mention the Polaski factors merits remand.  (Doc. 9).  The Court disagrees.  The ALJ may not have cited the Polaski decision itself, but he specifically cited SSR 96-7p, which incorporates the Polaski factors.  (Tr. 16).  Moreover, as was done in Strongson, supra, the ALJ in the instant case acknowledged his task of making a finding on credibility, and then discussed in detail why the medical evidence was inconsistent with Plaintiff's testimony.  (Tr. 16-17).

-21-

Regarding Plaintiff's complaints of mental and social impairments, the ALJ noted that Dr. Hudson did not find any limitations related to Plaintiff's disruptive behavior disorder.  In fact, he found Plaintiff was pleasant and cooperative, exhibited no anxiety or anger, was able to do arithmetic in his head, and displayed no difficulty following instructions.  (Tr. 150-53).  Moreover, as discussed above, Plaintiff stated that he handled stress relatively well, and was not actually fired from his last job, but chose to quit for being threatened with firing for inability to get along with "a couple of guys" and absences.  (Tr. 101, 128-30).

With regard to Plaintiff's visual problems, the ALJ discussed Dr. Priscilla Arnold's findings that Plaintiff's vision problem could be helped significantly by having prescription glasses made.  Plaintiff's visual acuity of 20/400 in each eye could be corrected to 20/40 in his right eye and 20/50 in his left. (Tr. 154-57).  Dr. Arnold noted, however, that Plaintiff had not had true prescription glasses in twenty years, and Plaintiff offered no reason for not having obtained such glasses. See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir .1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.").  Moreover, there is no record of Plaintiff scheduling a follow-up with a specialist after his diagnosis of traumatic iritis as he was instructed to do.  And, although Plaintiff's wife reported that they were gathering paperwork for Plaintiff to seek treatment at the Christian Clinic, Plaintiff failed to present any evidence that he was denied treatment due to lack of finances.  A lack of means to pay for medical services does not "*ipso facto* preclude the [Commissioner] from considering the failure to seek medical attention in credibility determinations." Benskin v. Bowen, 830 F.2d 878, 885 n.1 (8th Cir. 1987); see also Webb v. Astrue, 2:10-cv-2032, 2011 WL 98925, at *5 (W.D. Ark. Jan. 12, 2011).

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities.  The record reveals Plaintiff was able to gather brush, wood, and paper to burn in the yard, take out the trash, mow the lawn, and prepare simple meals.  (Tr. 95, 97, 141, 251-52).  While Plaintiff claimed his inability to get along with others rendered him unable to work a job requiring incidental contact with co-workers, the record shows that Plaintiff did maintain some level of friendship with others, despite his anger problems.  (Tr. 100, 245-46, 254).

The Court believes that Plaintiff's testimony does not support the limiting effects alleged, and that the RFC, discussed below, takes into account the limitations described.  Accordingly, the Court believes that substantial evidence supports the ALJ's conclusion that Plaintiff's complaints were not totally credible.

### E.    RFC Assessment

The Court believes there is substantial evidence to support the ALJ's RC determination.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  Lewis v. Barnhart, 353 F.3d 642,

-23-

646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

In the present case, the ALJ considered the medical assessments of examining agency medical consultants, Plaintiff's subjective complaints, and Plaintiff's medical records, when he determined that Plaintiff could:  perform work that did not require excellent far visual acuity; understand, remember, and carry out simple, routine, and repetitive tasks;  respond appropriately to supervisors and usual work situations; and have occasional contact with co-workers, but with no contact with the general public.

As discussed above, Dr. Hudson did not note any limitations that accompanied the diagnosis of disruptive behavior disorder, and found Plaintiff cooperative and able to follow instructions.  (Tr. 150-53).  Furthermore, Dr. Hudson stated that his literacy and IQ problems would only limit him to labor jobs.  (Tr. 152).  Dr. Arnold found that Plaintiff's visual acuity could be significantly improved with prescription glasses.  (Tr. 17).  The ALJ also mentioned the opinions of the state agency medical consultants, and in light of the record as a whole, concurred with their opinions that Plaintiff was capable of unskilled work not requiring excellent far visual acuity.  (Tr. 17).  Finally, the ALJ also considered that Plaintiff's medically determinable history of alcohol abuse was not a material factor, despite the possibility that it may have increased the effects of his disruptive behavior disorder in the past, as Plaintiff reported that he had not used alcohol in two years.  (Tr. 18).  The Court concludes that substantial evidence supports the ALJ's RFC determination.

AO72A
(Rev. 8/82)

**F.**     **Hypothetical Proposed to Vocational Expert**

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ proposed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the VE's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing past relevant work as a lumber stacker. (Tr. 18). See Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (holding that testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.**     **Conclusion**

Based on the foregoing, the Court affirms the ALJ's decision and dismisses Plaintiff's case with prejudice.

DATED this 14th day of April 2011

/s/ *Erin L. Setser*

HON. ERIN L. SETSER

UNITED STATES MAGISTRATE JUDGE

-25-